# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   2:21-MJ-02528 |
| | ) | |
| One (1) silver LG cellular telephone, IMEI 354525111819296 | ) ) ) | |
| | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances) and 18 U.S.C. §§ 922(g) (prohibited person in possession of a firearm) and 924(c) (possession of a firearm in furtherance of a drug trafficking crime)

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Charles Adam*
_____
*Applicant's signature*

*FBI Special Agent Charles Adam*
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date and Time: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>          Hon. Margo A. Rocconi, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Sara Milstein (x8611)

**<u>ATTACHMENT A</u>**

<u>PROPERTY TO BE SEARCHED</u>

The following digital device, seized on May 19, 2021, and currently maintained in the custody of the Long Beach Police Department in Long Beach, California:

1.   One (1) silver LG cellular telephone, IMEI 354525111819296 (the "SUBJECT DEVICE").

## ATTACHMENT B

**I.    ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances) and 18 U.S.C. §§ 922(g) (prohibited person in possession of a firearm) and 924(c) (possession of a firearm in furtherance of a drug trafficking crime (the "Subject Offenses"), namely:

a.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

b.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

c.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written

communications sent to or received from any digital device and
which relate to the above-named violations;

        d.   Records, documents, programs, applications,
materials, or conversations relating to the trafficking of
drugs, including ledgers, pay/owe records, distribution or
customer lists, correspondence, receipts, records, and documents
noting price, quantities, and/or times when drugs, guns, or
ammunition were bought, sold, or otherwise distributed;

        e.   Audio recordings, pictures, video recordings, or
still captured images related to the purchase, sale,
transportation, or distribution of drugs, guns, or ammunition;

        f.   Contents of any calendar or date book;

        g.   Global Positioning System ("GPS") coordinates and
other information or records identifying travel routes,
destinations, origination points, and other locations; and

        h.   Any SUBJECT DEVICE which is itself or which
contains evidence, contraband, fruits, or instrumentalities of
the Subject Offense/s, and forensic copies thereof.

        i.   With respect to any SUBJECT DEVICE containing
evidence falling within the scope of the foregoing categories of
items to be seized:

           i.   evidence of who used, owned, or controlled
the device at the time the things described in this warrant were
created, edited, or deleted, such as logs, registry entries,
configuration files, saved usernames and passwords, documents,
browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

iii

          ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

          iii. evidence of the attachment of other devices;

          iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

          v.   evidence of the times the device was used;

          vi.  passwords, encryption keys, and other access devices that may be necessary to access applications or items on the device;

          vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

          viii.   records of or information about Internet Protocol addresses used by the device;

          ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICE

3.    In searching the SUBJECT DEVICE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.    The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.    The search team shall complete the search of the SUBJECT DEVICE as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device beyond this 120-day period without obtaining an extension of time order from the Court.

d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the

scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        e.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

        f.  If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

        g.  If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

        h.  If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data

falling within the list of other items to be seized, the
government may retain the digital device and any forensic copies
of the digital device, but may not access data falling outside
the scope of the other items to be seized (after the time for
searching the device has expired) absent further court order.

i.   The government may also retain a SUBJECT DEVICE
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been
able to fully search a device because the device or files
contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT
DEVICE, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

4.   The review of the electronic data obtained pursuant to
this warrant may be conducted by any government personnel
assisting in the investigation, who may include, in addition to
law enforcement officers and agents, attorneys for the
government, attorney support staff, and technical experts.
Pursuant to this warrant, the investigating agency may deliver a
complete copy of the seized or copied electronic data to the
custody and control of attorneys for the government and their
support staff for their independent review.

5.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices

pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

## AFFIDAVIT

I, Charles Adam, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is also made in support of an application for a warrant to search the following digital device (the "SUBJECT DEVICE"), in the custody of Long Beach Police Department, in Long Beach, California, as described more fully in Attachment A:

a.    One (1) silver LG cellular telephone, IMEI 354525111819296.

2.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances) and 18 U.S.C. §§ 922(g) (prohibited person in possession of a firearm) and 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated

otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4.     I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed for approximately 15 years.  I am presently assigned to the Violent Crime Major Offenders squad of the Long Beach Resident Agency where I primarily investigate violent street gangs.  Prior to my position as an FBI SA, I served as a Los Angeles Police Department police officer from August 2000 to April 2006.

5.     During the course of my law enforcement career, I have participated in the preparation and execution of hundreds of search warrants, numerous controlled purchases of drugs and guns, hundreds of surveillance operations, the interception of consensually monitored telephone calls and court-authorized wiretaps, and arrests of hundreds of drug users, narcotics traffickers, and members and associates of criminal street gangs.  I have also handled confidential human sources, as well as spoken with criminal defendants and witnesses who possessed extensive knowledge of the inner workings of gangs and drug trafficking organizations.  Additionally, I have testified in both state and federal courts.  I also consult regularly with other narcotics and gang experts regarding the methods and practices of street gang members participating in violent crimes and drug trafficking.

### III.  **SUMMARY OF PROBABLE CAUSE**

6.   On March 11, 2021, ANDRE POINDEXTER ("POINDEXTER"), a convicted felon, was arrested by Long Beach Police Department ("LBPD") for possession of approximately 90 grams of methamphetamine and a firearm.  On May 19, 2021, POINDEXTER was arrested upon federal indictment for the same conduct on charges of possession with intent to distribute methamphetamine, possession of a firearm in furtherance of drug trafficking, and being a felon in possession of a firearm.  Upon his federal arrest, POINDEXTER possessed the SUBJECT DEVICE and said it was the same cell phone he possessed at the time of his original arrest on March 11, 2021.  POINDEXTER gave me verbal consent to search the SUBJECT DEVICE, and from my search, I saw text messages in which he was discussing the transportation of two ounces of illegal drugs for further distribution.

### IV. **STATEMENT OF PROBABLE CAUSE**

7.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    Background**

8.   On March 11, 2021, LBPD police officers were conducting directed enforcement targeting gang related and violent crimes in the area of Pine Avenue and Hill Street in Long Beach, California, when their attention was drawn to a Dodge Journey (the "Dodge"), California license plate 8MUJ758, with tinted windows, in violation of California Vehicle Code section 26708(a)(1).  Officers saw the Dodge's registration was

expired, in violation of California Vehicle Code section
4000(a)(1).  The officers then saw the Dodge fail to stop for a
stale red light as it negotiated a right turn from westbound
Hill Street to northbound Pacific Avenue.  The officers saw the
Dodge switch lanes without signaling, in violation of California
Vehicle Code section 22108.

9.   The officers activated the police vehicle's lights and
siren and initiated a traffic stop.  In response to the
activation of the police vehicle's forward-facing red light and
audible siren, the Dodge quickly accelerated and switched lanes
in an apparent attempt to flee from the police officers.  Due to
the high volume of traffic, and so as to avoid endangering
drivers and pedestrians, the officers did not speed after the
Dodge.  Instead, the officers turned off the police vehicle's
red light and siren, and followed the path of travel of the
Dodge and found the Dodge had collided into a two-foot concrete
planter.

10.  The officers approached the Dodge and saw the driver
(later identified as POINDEXTER) leaning over his right shoulder
with his arms fully extended towards the rear of the front
passenger seat.  The officer approached the driver and
immediately recognized the him as POINDEXTER, an East Side Longo
gang member with whom he had previously contacted on several
occasions.  The officer was aware POINDEXTER was on active
probation and subject to search conditions, and that PONIDEXTER
did not have a valid driver's license.  The officers ordered
POINDEXTER out of the Dodge and handcuffed him.

4

11.   The officer opened the rear driver's side door and saw in plain view a handgun -- a 9mm High Point with serial number P202250 -- lying on the rear seat behind the front passenger seat in the location where the officer had just seen POINDEXTER reaching.

a.   An Interstate Nexus expert from the Bureau of Alcohol, Tobacco, Firearms and Explosives later examined the handgun and 9mm cartridges seized from POINDEXTER on March 11, 2021, and confirmed that the handgun and ammunition were manufactured outside of the State of California.  Because the handgun and ammunition were found in California, I believe that it has traveled in and affected interstate commerce.

12.   The officers recovered from the front passenger floorboard a blue bag containing a large plastic bag containing an off-white substance resembling methamphetamine, plastic bags, and a digital scale.

a.   The suspected drugs were later sent to the Drug Enforcement Administration ("DEA") laboratory for further examination.  Upon examination, the DEA laboratory determined the suspected drugs were 85 grams of actual methamphetamine.

13.   POINDEXTER was arrested on state charges of felon in possession of a firearm and possession of methamphetamine with intent to sale and transported to LBPD for further investigation.  POINDEXTER was issued his Miranda rights and agreed to waive them and participate in an interview with LBPD.

14.  Based on my review of a report of the interview and from watching the audio/video recording of the interview, I know that POINDEXTER said the following, in substance and in part:

a.  The registered owner of the Dodge gave POINDEXTER permission to drive the Dodge.

b.  POINDEXTER did not stop for the police because he panicked.

c.  POINDEXTER knew he possessed the handgun and said he was trying to get rid of it when the officers approached the Dodge.

d.  POINDEXTER admitted the methamphetamine in the Dodge was his.

15.  At the time of arrest, POINDEXTER was in possession of a cellular telephone, later determined to be the SUBJECT DEVICE. However, the officers placed the SUBJECT DEVICE in POINDEXTER's personal property and did not book the item as evidence. POINDEXTER was summarily released and POINDEXTER collected his personal property, including the cellular telephone.

a.  Based on my review of LBPD's bodycamera video, I know that POINDEXTER asked LBPD officers to provide him with some contact numbers from the SUBJECT DEVICE, and the officers agreed to do so.  I have no knowledge that any officer searched the SUBJECT DEVICE other than to provide POINDEXTER with the contact information he requested.

16.  On May 18, 2021, a federal grand jury sitting in the Central District of California indicted POINDEXTER  by charging him with possession with intent to distribute methamphetamine,

in violation of Title 21, United States Code, Sections
841(a)(1), (b)(1)(A); possession of a firearm in furtherance of
a drug trafficking crime, in violation of Title 18 United States
Code, Section 924(c)(1)(A)(i); and being a felon in possession
of a firearm and ammunition, in violation of Title 18 United
States Code, Section 922(g)(1).  See CR No. 2:21-00243.

**B.   POINDEXTER's Federal Arrest and Post-Miranda
       Statements**

17.  On May 19, 2021, LBPD Detective Lobascio and I
arrested POINDEXTER pursuant to the arrest warrant issued for
the above federal indictment.  At the time of arrest, POINDEXTER
was in possession of the SUBJECT DEVICE.

18.  While transporting POINDEXTER to his initial
appearance, and while POINDEXTER was handcuffed, POINDEXTER
spontaneously asked me to provide him with several telephone
numbers from the SUBJECT DEVICE.  I asked POINDEXTER for his
permission to search the SUBJECT DEVICE.  He gave me verbal
consent to search the phone.  Before opening the device,
POINDEXTER told me the following, in substance and in part:

a.   POINDEXTER stated the SUBJECT DEVICE in his
possession at the time of his arrest was the same cellular
telephone in his possession at the time he was initially
arrested for the firearm and methamphetamine in March 2021.

b.   POINDEXTER said that he bought the SUBJECT DEVICE
off "the street," and that there may be old messages from other
people.

c.    POINDEXTER provided me with the passcode for the SUBJECT DEVICE, and I used it to unlock the SUBJECT DEVICE.

19.   After unlocking the SUBJECT DEVICE, I placed the SUBJECT DEVICE on the seat next to POINDEXTER and allowed him to scroll through the contact list.  As POINDEXTER scrolled through the contact list, I saw the name "Bonus" and recognized it because of my involvement in a broader investigation into a criminal street gang called the Longos, of which POINDEXTER is a member with multiple Longos gang tattoos.

20.   I then asked POINDEXTER who "Bonus" is.  POINDEXTER replied that "Bonus" was a "paisa" whom he met at a trade school, where they learned to lay drywall.

a.    Based on my training and experience, I know the term "paisa" to be street vernacular for a man originating from Mexico who has not assimilated to American culture.  The term is frequently used by gang members to identify a person who is involved in criminal activities, but who is not, himself, a gang member.

21.   I clicked on the text message string involving "Bonus" and saw a message in which "Bonus" asked if POINDEXTER had given "two zones" to "Amparo."

a.    Based on my training and experience, as well as my knowledge about POINDEXTER's methamphetamine possession and Bonus's involvement in drug trafficking, I believe that in this text message, "Bonus" was asking POINDEXTER if he had delivered two ounces of drugs to a person named Amparo.

8

22.   Upon arriving at United States Marshall's Service ("USMS") lockup at the United States Courthouse in Los Angeles, California, we were advised that USMS would not accept POINDEXTER for his initial appearance as we arrived after 12:00 p.m.

23.   We then transported POINDEXTER to LBPD for detention overnight.  During transport to LBPD custody, POINDEXTER became agitated and said he did not want to talk anymore with Detective Lobascio or me.  We did not ask POINDEXTER any questions about his case or himself after that, and did not speak with him other than to help him calm down.  At no point did POINDEXTER request a lawyer or withdraw the consent he gave to search the SUBJECT DEVICE.

24.   During the booking process at LBPD, POINDEXTER was asked to confirm his verbal consent to search the SUBJECT DEVICE by signing a written waiver.  POINDEXTER refused to sign the consent to search form and said we "could get into it" on our own.

C.   **Criminal History**

25.   On May 19, 2021, I reviewed certified conviction documents for POINDEXTER and learned that POINDEXTER has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a.   On or about August 31, 1999, a violation of 11377 H&S (Possession of Methamphetamine), in the Superior Court for the State of California, County of Los Angeles, Case Number NA041755;

b.    On or about January 20, 2000, a violation of 11350(A) H&S (Possession of Controlled Substance), in the Superior Court for the State of California, County of Los Angeles, Case Number NA 043486;

c.    On or about December 17, 2002, a violation of 459 PC (Burglary), in the Superior Court for the State of California, County of Los Angeles, Case Number TA 067659 02;

d.    On or about November 7, 2006, a violation of 12021(A(1) PC (Felon in Possession of Firearm), in the Superior Court for the State of California, County of Los Angeles, Case Number NA 072094;

e.    On or about January 6, 2010, a violation of 12021(A)(1) PC (Felon in Possession of Firearm), in the Superior Court for the State of California, County of Los Angeles, Case Number NA 084360;

f.    On or about January 11, 2012, a violation of 12031(A)(1) PC (Felon Carrying a Loaded Firearm), in the Superior Court for the State of California, County of Los Angeles, Case Number NA 090969;

g.    On or about October 10, 2013, a violation of 11379(A) H&S (Possession of Methamphetamine for Sales), in the Superior Court for the State of California, County of Los Angeles, Case Number NA 096893;

h.    On or about July 28, 2016, a violation of 29800(A)(1) PC (Possession of a Firearm by a Prohibited Possessor), in the Superior Court for the State of California, County of Los Angeles, Case Number NA 102495 01;

i.  On or about July 18, 2019, a violation of 11378(A) H&S (Possession of Methamphetamine for Sales), in the Superior Court for the State of California, County of Los Angeles, Case Number NA 112346 01;

j.  On or about July 28, 2016, a violation of 11378 H&S (Possession of Methamphetamine for Sales), in the Superior Court for the State of California, County of Los Angeles, Case Number NA 104075 01;

k.  On or about July 28, 2019, a violation of 11370.1(A) H&S (Possession of a Controlled Substance while Armed), in the Superior Court for the State of California, County of Los Angeles, Case Number NA 104332 01; and

l.  On or about December 7, 2020, a violation of 11379(A) H&S (Possession of Methamphetamine for Sales) and 148 PC (Resisting a Peace Officer), in the Superior Court for the State of California, County of Los Angeles, Case Number NA 115184 01.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

26.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their

illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

      b.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

      c.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

      d.  Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

## VI. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

27.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.  Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.  Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.  Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience,

13

individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

### VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

28. As used herein, the term "digital device" includes the SUBJECT DEVICE.

29. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

14

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

30.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

31.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

## VIII.     <u>CONCLUSION</u>

32.   For all of the reasons described above, there is probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
_____, 2021.


_____
UNITED STATES MAGISTRATE JUDGE

17

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital device, seized on May 19, 2021, and currently maintained in the custody of the Long Beach Police Department in Long Beach, California:

1.    One (1) silver LG cellular telephone, IMEI 354525111819296 (the "SUBJECT DEVICE").